**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GARY R.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 20 C 6109 |
| v. | ) | |
| | ) | |
| KILOLO KIJAKAZI, Acting Commissioner | ) | Judge Rebecca R. Pallmeyer |
| of Social Security,[2] | ) | |
| | ) | |
| Defendant. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Gary R. appeals the Social Security Administration's denial of his claim for disability insurance benefits under the Social Security Act. For the following reasons, the court remands the matter to the Administrative Law Judge ("ALJ") for further consideration.

<u>**BACKGROUND**</u>

Plaintiff applied for disability insurance benefits on February 23, 2018, alleging disability as of January 31, 2018.[3] (Administrative Record [10] ("R.") at 250–51.) He claimed several impairments, including lower back problems, arthritis in both knees, right hip pain, seizures, and depression. (R. 139–40.) The Administration denied Plaintiff's claim at the initial and reconsideration stages of administrative review. (R. 139–69.) Plaintiff then requested a hearing and eventually appeared before an ALJ on October 11, 2019. (*See* R. 184–88 (request for hearing); R. 76–120 (hearing transcript).) Plaintiff was represented by counsel at the hearing,

---

[1]　　　In accordance with this district's Internal Operating Procedure 22, the court refers to Plaintiff only by his first name and the first initial of his last name.

[2]　　　Under Federal Rule of Civil Procedure 25(d), the court has substituted Kilolo Kijakazi, the Acting Commissioner of the Social Security Administration, for her predecessor, Andrew M. Saul.

[3]　　　Plaintiff previously applied for benefits, and his request was denied on September 28, 2017. (R. 121–38 (decision denying that request).) Neither the ALJ nor the parties discuss this past denial of benefits, so this court does not either.

and an impartial vocational expert testified.  (R. 76.)  The ALJ denied Plaintiff's request in a written decision dated April 1, 2020.  (R. 12–29.)

Because the Appeals Counsel declined to review the denial (R. 1–3), the ALJ's decision stands as the agency's final decision for the purpose of judicial review.  *Butler v. Kijakazi*, 4 F.4th 498, 500 (7th Cir. 2021).  Plaintiff timely sought review in this court under 42 U.S.C. § 405(g). (*See* Compl. [1].)

The court begins by summarizing Plaintiff's medical records, the medical opinions submitted in connection with his application for disability benefits, the administrative hearing before the ALJ, and the ALJ's opinion.

## I.    Medical Records

### A.    Knee, Hip, and Back Impairments

The administrative record contains medical records from February 2017 to October 2019. During this period, Plaintiff underwent bilateral total knee replacements and was diagnosed with osteoarthritis in his hips[4] and degenerative disc disease of the lumbar spine.[5]  Additionally, Plaintiff was obese or morbidly obese throughout this time period, with a body mass index (BMI) ranging from 37 to 43.[6]  (*See e.g.*, R. 403, 418, 904, 922.)

On February 1, 2017, at the start of the medical records, Dr. Hue Luu, an orthopedist at University of Chicago, ordered diagnostic imaging of Plaintiff's left knee, which revealed severe osteoarthritis.  (R. 313, 416, 477.)  Dr. Luu scheduled Plaintiff for a "total knee arthroplasty" (*i.e.*,

---

[4]    Osteoarthritis is a type of arthritis affecting the joints.  *See* https://medlineplus.gov/ osteoarthritis.html.  All websites cited in this opinion were last visited on September 28, 2022.

[5]    Degenerative disc disease of the lumbar spine occurs when discs separating the bones of the lumbar spine—the five vertebrae in the lower back—start to break down.  *See* https://medlineplus.gov/genetics/condition/intervertebral-disc-disease; https://my.clevelandclinic.org/health/articles/22396-lumbar-spine.

[6]    "A person with a BMI of 30 or higher is classified as obese, and if his or her BMI is above 40 as morbidly obese."  *Browning v. Colvin*, 766 F.3d 702, 704 (7th Cir. 2014).

total knee replacement)[7] due to his "significant left knee arthritis."  (R. 480.)  Later that month, additional imaging confirmed the severe left knee osteoarthritis, revealed mild osteoarthritis of the left hip and ankle, and showed mild soft tissue swelling around the left ankle.  (R. 493.)  A pre-operation physical therapy assessment further showed that Plaintiff had antalgic gait (an abnormal pattern of walking due to pain)[8] and functional limits in standing, walking, and climbing stairs.  (R. 513.)

On February 15, 2017, Plaintiff saw Dr. Geetha Govindarajan, his primary care provider, whom he saw every few months.  (R. 393, 723.)  At this appointment, Dr. Govindarajan noted that Plaintiff was awaiting an orthopedic surgery scheduled for March 7 (the total left knee replacement discussed below), and she assessed his "daily" knee pain as a nine out of ten.  (R. 395.)  She further noted that Plaintiff "still" presented with intermittent swelling in his leg and had a history of bilateral lower extremity edema (swelling caused by fluid in the body's soft tissues).[9]  (R. 395–96.)  As for his medical problems, Dr. Govindarajan noted Plaintiffs' obesity, edema, left ankle pain, left knee osteoarthritis, depression, and seizures.  (R. 397–98.)

On March 7, 2017, Dr Luu performed a total replacement of Plaintiff's left knee.  (R. 557–59.)  Two weeks later, a University of Chicago physical therapist, Michael Jordan, noted "considerable swelling" in Plaintiff's left leg, but imaging showed no evidence of deep vein thrombosis (i.e., blood clots)[10] or obstruction in the left leg.  (R. 649, 654.)  When Plaintiff saw the physical therapist a month after the surgery, his range of motion was "much improved."  (R. 664.)  But when Plaintiff again saw his primary care provider, Dr. Govindarajan on April 11, the doctor listed the same medical issues as in the prior appointment.  (R. 403, 407–08.)  She also noted

---

[7]  See https://medlineplus.gov/kneereplacement.html.

[8]  See https://www.ncbi.nlm.nih.gov/books/NBK559243.

[9]  See https://medlineplus.gov/edema.html.

[10]  See https://medlineplus.gov/deepveinthrombosis.html.

that Plaintiff assessed his daily back and knee pain as a seven out of ten, though he was "doing well" after his knee surgery. (R. 404–05, 408.) Later that month, on April 18, Dr. Luu noted that Plaintiff was doing well at six-weeks post-operation. (R. 671.) When Plaintiff saw Dr. Govindarajan in late June 2017, she too noted that he was doing well post-surgery. (R. 412, 416.) She also noted (apparently for the first time) that Plaintiff was walking with a cane and "favor[ed] the left." (R. 415.) Plaintiff testified at the administrative hearing that a doctor prescribed the cane (R. 107), but the medical records do not make clear who this doctor was or when this occurred. In August, Plaintiff denied any pain in his left knee and Dr. Luu concluded that he was "doing well." (R. 707)

By November 1, 2017, Plaintiff reported that his right knee was "beginning to hurt," and complained of "lower back pain radiating to the buttock." (R. 419–20.) Dr. Govindarajan ordered imaging of Plaintiff's lumbar spine and right knee, which revealed severe degenerative disc disease at several lumbar vertebrae (L3 to L4)[11] and mild to moderate osteoarthritis in the right knee. (R. 422, 711.) The following month, Plaintiff underwent imaging of his right hip, right knee, and pelvis, which showed mild osteoarthritis of both hips and, once again, degenerative disc disease in his lower lumbar spine. (R. 717.) When Plaintiff saw Dr. Govindarajan on December 26, she noted these diagnoses. (R. 430, 432.) Plaintiff also told Dr. Govindarajan that he "was seen in the [emergency room] for [those] pains."[12] (R. 432.)

In early January 2018, an orthopedist at the University of Chicago, Dr. Roderick Birnie, saw Plaintiff for complaints of right knee, right hip, and low back pain. (R. 727–28.) Dr. Birnie

---

[11]    The lumbar spine consists of five vertebrae, known as L1 to L5. *See* https://my.clevelandclinic.org/health/articles/22396-lumbar-spine.

[12]    As best the court can tell, the administrative record does not contain records from this emergency room visit.

diagnosed Plaintiff with right knee osteoarthritis and right leg sciatica.[13] (R. 728.) He also ordered an MRI of Plaintiff's lumbar spine, which again revealed multilevel degenerative disc disease, most severe at L3 to L4. (R. 735–36.) On physical examination, Plaintiff had antalgic gait, positive straight leg raise (which indicates lumbar disc herniation),[14] and tenderness in the right knee. (R. 728.) At this appointment with Dr. Birnie, Plaintiff was given an anesthetic/steroid injection to alleviate pain in his right knee. (R. 728.) Plaintiff also followed up with the Pain Clinic at the University of Chicago in late January 2018 for his low back pain and, at the direction of Dr. Sarah Choxi, an anesthesiologist at the clinic, returned in February for a lumbar epidural steroid injection. (R. 738–39, 745, 750.)

In May 2018, Plaintiff underwent a physical consultative examination conducted by a state agency consultant, Dr. Jeffery Ryan. (*See* R. 772–82.) Dr. Ryan noted that Plaintiff had antalgic gait, moderate difficulty walking, and negative straight leg raise, as well as tenderness and reduced range of motion in his right hip, both knees, and lumbar spine. (R. 773–75.) At a July 2 appointment with Dr. Govindarajan, Plaintiff reported that he could walk only half a block with his cane and could sit or stand for only about 30 minutes before needing to change positions. (R. 798–99.) Dr. Govindarajan also noted that Plaintiff's "chronic" edema did not show significant improvement with Lasix (a medication that Plaintiff had previously taken to treat edema),[15] and that Plaintiff's right knee pain and lumbar disc disease were being treated, in part, with injections. (R. 802.) The same month, Dr. Govindarajan completed a questionnaire on Plaintiff's physical

---

[13] Sciatica is pain, weakness, numbness, or tingling that typically starts in the lower back and extends down the leg. It is caused by problems with the sciatic nerve, which controls the muscles in the lower leg and back of the knee. *See* https://medlineplus.gov/sciatica.html.

[14] The straight leg raise test is used during physical examinations of patients with lower back pain. It is performed by the examiner raising the patient's leg by flexing the hip with the knee in extension. The test is considered positive if the patient experiences pain in certain parts of his body. A positive result may indicate several conditions, the most common being lumbar disc herniation. *See* https://www.ncbi.nlm.nih.gov/books/NBK539717.

[15] https://www.webmd.com/drugs/2/drug-3776-8043/lasix-oral/furosemide-oral/details.

limitations, described in further detail below. In this questionnaire, Dr. Govindarajan noted that Plaintiff had left knee osteoarthritis, bilateral knee pain, limited gait, left knee joint effusion (swelling caused by excess fluid around the joint),[16] and bilateral edema, as well as seizures and depression. (R. 876.)

Plaintiff had several follow-up visits at the University of Chicago Pain Clinic, between summer 2018 and early 2019. In June 2018, Plaintiff reported that the lumbar epidural steroid he had received in February had "helped substantially" with his pain, but the most recent injection, in May, did not.[17] (R. 842.) In August, Plaintiff underwent an anesthetic/steroid injection in the right sacroiliac joint (which connects the spine to the pelvis)[18] and the right knee. (R. 858, 874.) He received a lumbar epidural injection in October and another anesthetic/steroid injection in his right hip joint in January 2019. (R. 1015–16, 1041–42.) In late November 2018, Plaintiff saw Dr. Govindarajan, who reported the same medical issues as in prior visits. (R. 906–07, 909–10.)

In January 2019, Plaintiff informed the knee surgeon, Dr. Luu, that he wished to undergo a total right knee replacement, because the pain had not been controlled by more conservative measures, including injections, physical therapy, and NSAIDs (pain relievers that include aspirin and ibuprofen).[19] (R. 1057–58.) On March 28, Plaintiff underwent that surgery. (R. 1154–56.) At the three-week follow-up, a nurse, Lauren Creighton, noted that Plaintiff "has been doing well" post-surgery, but had right lower leg swelling similar to the swelling after his total left knee replacement. (R. 1256.) In May 2019, at his six-week follow-up with Dr. Luu, Plaintiff had

---

[16]    See https://medlineplus.gov/lab-tests/synovial-fluid-analysis.

[17]    As best the court can tell, the administrative record does not contain records of this May injection.

[18]    See https://medlineplus.gov/ency/patientinstructions/000610.htm.

[19]    See https://my.clevelandclinic.org/health/drugs/11086-non-steroidal-anti-inflammatory-medicines-nsaids.

"excellent range of motion and painless ambulation," but continued swelling in his right leg; Dr. Luu recommended elevation and a compression sock. (R. 1278–79.)

Several professionals at the University of Chicago observed that Plaintiff's swelling continued the following month. On June 6, 2019, a physician's assistant, Derrick Brown, instructed Plaintiff to elevate his legs and to wear compression socks at all times during the day (neither of which Plaintiff was reportedly doing "as often as . . . he probably should"). (R. 1288.) The next day, June 7, a physical therapist, Courtney Mueller, noted that Plaintiff presented with bilateral edema (with the right leg worse than the left), as well as decreased hip strength, decreased balance, and "decreased activity tolerance." (R. 1298.) At another appointment on June 18, Mueller reminded Plaintiff to wear the compression socks all day, not just at home. (R. 1309.) By June 26, Mueller noted that Plaintiff's right-leg swelling had "decreased greatly." (R. 1318.) When he visited the Pain Clinic at the end of June, Plaintiff denied any knee pain, but reported pain in his right hip and low back. (R. 1323.) Plaintiff received an anesthetic and steroid injection in his right hip joint the following month. (R. 1365.)

In early July 2019, Plaintiff again saw Dr. Govindarajan, who updated his records to reflect the total bilateral knee replacement. (R. 929–30.) Around the same time, Plaintiff told his physical therapist, Courtney Mueller, that his right leg swelling was "improving slightly" but the right knee remained "slightly painful." (R. 1352.) Later that month, Plaintiff went to the emergency department at the University of Chicago due to right leg swelling; it is unclear what treatment he received. (R. 1359–60.) In August 2019, Dr. Govindarajan completed another questionnaire, noting Plaintiff's lumbar disc disease, total bilateral knee replacement, bilateral knee pain, back pain, and swelling in both legs, as well as his seizure disorder and depression. (R. 971.) That same month, Dr. Govindarajan ordered an ultrasound of Plaintiff's lower extremities due to edema; the imaging again did not show any blood clots or obstructions. (R. 1382–83.) Dr. Luu reviewed this testing and noted that Plaintiff had "persistent lymphedema" (swelling caused by

fluid building up in the soft tissues),[20] which had "not affected his range motion [or] recovery" from his total right knee replacement. (R. 1388.) Chronic right leg swelling prompted Plaintiff to make another emergency department visit, in August 2019, to St. Catherine Hospital. (R. 1414.)

### B. Psychological Impairments

Beginning at least as early as February 2017, Plaintiff's primary care provider, Dr. Govindarajan, noted he suffered from depression. (*See, e.g.*, R. 398, 435, 803.) During his regular visits with Dr. Govindarajan, Plaintiff had PHQ-9[21] scores that indicated moderately severe or severe depression. (*See, e.g.*, R. 798–99, 906.) At some visits, Plaintiff also had scores on the GAD-7 scores (a measure of generalized anxiety disorder[22]) that indicated severe anxiety. (R. 905–06, 923–24.) In May 2018, Plaintiff underwent a mental-status evaluation conducted by state agency consultant William Skoubis, Psy.D, who concluded that Plaintiff "did not show evidence of a psychological disorder at this time." (R. 785.) But when Plaintiff next saw Dr. Govindarajan, in July 2018, she again noted that Plaintiff suffered from depression and recommended a psychiatric follow-up. (R. 803.)

Later that month, on July 30, Plaintiff presented for a psychiatric evaluation with Dr. Israr Abbasi. Plaintiff reported decreased energy and motivation, crying spells, feeling "excessively sad and irritable most of the time," and being unable to "concentrate while communicating" or "comprehend while reading a book." (R. 788–89.) Dr. Abbasi noted that Plaintiff had stopped taking medication prescribed for depression because it caused back pain, so Dr. Abbasi ordered new medication (Zoloft). (R. 788, 886.) But when Plaintiff saw Dr. Abbasi in September 2018, he had stopped taking the Zoloft because it caused severe headaches. Dr. Abbasi tried again, prescribing yet another medication, Citalopram—again without success. (R. 890, 893.) In

---

[20]    *See* https://medlineplus.gov/lymphedema.html.

[21]    The PHQ-9 (Patient Health Questionnaire-9) objectifies and assesses degree of depression severity. See https://www.mdcalc.com/calc/1725/phq9-patient-health-questionnaire9

[22]    See https://www.mdcalc.com/calc/1727/gad7-general-anxiety-disorder7

November 2018, Plaintiff told Dr. Abbasi that he had stopped Citalopram because it "made him pass out." (R. 897.) At this point, rather than prescribing another medication, Dr. Abbasi advised Plaintiff to get authorization for medical marijuana, which Plaintiff had reported helped him stay calm. (R. 897, 900.)

It appears that Plaintiff stopped seeing Dr. Abbasi around this time. In June 2019, Plaintiff saw another psychiatrist, Dr. Amber Kazi. (R. 916.) Plaintiff again reported feelings of sadness and anxiety, having low energy and motivation, and having self-harm or suicidal thoughts. (R. 916.) Plaintiff was not taking any medication for his depression, and Dr. Kazi prescribed a new medication (Celexa). (R. 919.) At a follow-up the next month, Dr. Kazi noted that Plaintiff was still on Celexa; he had improved, but still reported some anxiety and depression. (R. 936.) There are no further medical records.

### C. Seizures

Plaintiff also suffers from a seizure disorder, for which he is treated by Dr. Shasha Wu, a neurologist at the University of Chicago. (R. 313.) At an appointment on February 1, 2017, Dr. Wu noted that Plaintiff began experiencing seizures at 17 years old, after being hit on the head with a brick. (R. 484.) Though for a time he suffered from frequent grand mal seizures, he had not had such a seizure for ten years. (R. 484.) Instead, as of 2017, Plaintiff reportedly experienced absence seizures[23]--spells during which he stares off into space for three to five minutes at a time—two to three times each month, sometimes triggered by anger and depression. (R. 484.) Plaintiff takes Tegretol, a prescription epilepsy medication[24] which helped with the grand mal seizures but not the staring spells. (R. 484.) He began taking another anti-seizure medication, Keppra,[25] in June 2016; Keppra was effective in stopping the staring spells, but only

---

[23]    *See* https://medlineplus.gov/ency/article/000696.htm.

[24]    See https://www.rxlist.com/tegretol-drug.htm.

[25]    See https://www.webmd.com/drugs/2/drug-18053/keppra-oral/details

until February 2017, when they began again.  (R. 484.)  After the February 1 appointment, Plaintiff next saw Dr. Wu in August 2017.  She noted that since Plaintiff had begun taking Keppra alongside Tegretol, his seizures had decreased in frequency from two to three seizures per month to just one seizure in the previous six months.  (R. 697.)  Dr. Wu further noted that Plaintiff's "likely focal seizure"[26] was "fairly controlled on two [anti-epilepsy drugs]" and that Plaintiff "likely has right temporal epilepsy."[27]  (R. 697, 703.)

There are no medical records from Plaintiff's appointments with Dr. Wu in 2018.  The state agency consultant, Dr. Ryan, noted Plaintiff's neurological condition when he examined Plaintiff in May 2018.  Dr. Ryan observed that Plaintiff "was able to produce sustained, audible and understandable speech," and that his "cranial nerves were intact."  (R. 774.)[28]

Plaintiff saw Dr. Wu again in March 2019.  Dr. Wu's notes confirmed that Plaintiff's seizures had become less frequent while he was taking both Keppra and Tegretol, but that he had stopped taking medication regularly because he lost his health insurance for four months. (R. 1073.)  When taking these medications once a day, Plaintiff had two seizures a month. (R. 1073–74.)  Plaintiff had started taking his medication twice daily several weeks before the appointment, but the records do not make clear whether Plaintiff's change in dosage was due to insurance problems.  (*See* R. 1073–74.)  In a questionnaire completed in October 2019, Dr. Wu reiterated that Plaintiff has right temporal lobe epilepsy seizures that occur two to three time per month, at times without warning, and typically last three to five minutes, after which Plaintiff must

---

[26]     A "focal" or "partial" seizure occurs when the abnormal electrical disturbances that cause seizures remain in a limited area of the brain.  *See* https://medlineplus.gov/ency/article/000697.htm.

[27]     Temporal epilepsy is a seizure disorder that presents with seizure activity originating in the temporal lobes.  *See* https://www.ncbi.nlm.nih.gov/books/NBK549852.

[28]     The cranial nerve is a set of twelve nerves in the back of the brain, which send electrical signals between the brain and different parts of the neck, head, and torso. https://my.clevelandclinic.org/health/body/21998-cranial-nerves.

"re-orient" himself.  (R. 1405.)  His most recent known seizures occurred on March 25, 2019, April 15, 2019, and September 15, 2019.  (R. 1405.)

## II.    Medical Opinions

### A.    State Agency Psychological Opinions

On May 12, 2018, Plaintiff underwent a psychological consultative examination conducted by William Skoubis, Psy.D.  (*See* R. 783–85.)  Skoubis reviewed some of Plaintiffs' medical records from December 2017 and March 2018, and spent 35 minutes with Plaintiff.  (R. 783, 785.) He concluded that Plaintiff "did not show evidence of a psychological disorder."  (R. 785.)  At the initial level of determination on May 24, 2018, Russell Taylor, Ph.D., reviewed some of Plaintiff's records from February to May 2018, including Skoubis's examination, and concluded that there was "insufficient evidence" that Plaintiff suffered from depression or related disorders.  (*See* R. 139–146.)  David L. Biscardi, Ph.D., who also evaluated Plaintiff, concluded in November 2018 that Plaintiff had a "medically determinable impairment," which did not qualify as depression or a related disorder.  (*See* R. 161–62.)

### B.    State Agency Physical Opinions

On May 12, 2018, Plaintiff also underwent a physical consultative examination conducted by Dr. Ryan.  (*See* R. 772–75.)  Dr. Ryan spent 35 minutes examining Plaintiff and reviewed "some" of Plaintiff's medical records (though he did not clarify which).  (R. 772.)  Dr. Ryan opined that Plaintiff had back pain, knee pain, and right hip pain (which resulted in reduced range of motion and abnormal gait), as well as a seizure disorder (which, despite Plaintiff's medication, appeared to cause "frequent" seizures).  (R. 774–75.)

At the initial level of consideration on May 25, 2018, state agency consultant Dr. Richard Bilinsky found that Plaintiff was not disabled.  Dr. Bilinsky opined that Plaintiff (who had not yet undergone his total right knee replacement) could lift 20 pounds occasionally and 10 pounds frequently; had limited pushing and pulling ability in the lower extremities, including in operating foot controls; could stand for 2 hours per day; and could sit for 6 hours per day.  (*See* R. 146–51.)

11

Plaintiff also had postural limitations due to severe lumbar disc disease, total left knee replacement, bilateral hip osteoarthritis, and reduced right hip, bilateral knee, and lumbar range of motion: specifically, Plaintiff could occasionally stoop, kneel, crouch, crawl, and climb ramps/stairs, but could never climb ladders, ropes, or scaffolds. (R. 148.) Finally, due to Plaintiff's absence seizures, he must avoid vibration, machinery, heights, and other hazards. (R. 149.) At reconsideration in October 2018, Dr. Torra Jones affirmed this opinion. (*See* R. 158–61.)

C.      **Dr. Govindarajan**

In July 2018 and August 2019, Plaintiff's primary care physician, Dr. Govindarajan, provided responses to questionnaires concerning Plaintiff's limitations. (*See* R. 876–78, 971–73.)

The July 2018, Dr. Govindarajan noted Plaintiff's diagnoses and symptoms, including left knee osteoarthritis, bilateral knee pain, limited gain, and bilateral edema, as well as his seizures and depression. (R. 876.) Dr. Govindarajan opined that Plaintiff's pain or other symptoms would "frequently" (meaning between one-third and two-thirds of the workday) interfere with his concentration. (R. 876.) Furthermore, Plaintiff could walk only two blocks without rest or pain; could sit for just 45 minutes at one time and about two hours total in an eight-hour workday; and could stand for 45 minutes at one time and stand/walk less than two hours total. (R. 876–77.) Plaintiff needed a cane to walk or stand; needed to walk every 90 minutes; needed to shift positions at will; and, due to muscular aches and chronic fatigue, needed to take unscheduled breaks one to two times per workday. (R. 877.) Plaintiff also needed to elevate his legs at 90 degrees for 25 percent of the workday due to bilateral edema. (R. 877.) Plaintiff could lift 20 pounds occasionally and 10 pounds frequently. (R. 877.) He could be expected to miss about 4 days of work per month due to his impairments. (R. 878.)

The August 2019 opinion was similar. Dr. Govindarajan updated her diagnoses and symptoms to note total bilateral knee replacement and pain, lumbar disc disease and back pain, swelling in both legs and bilateral edema, as well as depression and seizures. (R. 971.) Dr.

Govindarajan again noted that Plaintiff's pain or other symptoms would frequently interfere with his attention and concentration, and that Plaintiff could walk for two blocks, stand for 45 minutes at once, and stand or walk no more than two hours total. (R. 971–73.) Plaintiff's other limitations had apparently worsened, however. Plaintiff could sit for just 30 minutes at one time and no more than two hours total. He needed to walk every 10 minutes (rather than every 90 minutes) and to take unscheduled breaks "possibly" as many as three to four times a day. (R. 972.) Plaintiff needed to elevate his legs 45 degrees three to four hours each workday[29] depending on the degree of swelling. (R. 972.) Plaintiff could still lift 10 pounds occasionally but could now lift 20 pounds only rarely. (R. 972.) He was again deemed likely to miss four days of work every month due to impairments. (R. 973.)

### D. Dr. Wu

In October 2019, Dr. Wu, who treated Plaintiff for seizure disorder, also completed a questionnaire concerning Plaintiff's limitations. (*See* R. 1405–07.) Dr. Wu noted that she saw him just once or twice a year. She reported that Plaintiff described his seizures as occurring two to three times per month, lasting three to five minutes (followed by additional time to "re-orient"), and coming on without warning. (R. 1405.) According to Dr. Wu, Plaintiff could safely work at heights, work with power machines, or operate a motor vehicle, but his seizures "maybe" would disrupt coworkers and that he would need more supervision at work than an unimpaired worker. (R. 1406.) He would need to take unscheduled breaks during the workday and then rest "until he returns to baseline"; Dr. Wu was uncertain how often this would happen. (*Id*.) Dr. Wu concluded that Plaintiff was capable only of low stress jobs and would be absent about one day per month due to his impairments. (R. 1406-07.)

---

[29] In response to the question, "what percentage of time during an 8-hour work day should the leg(s) be elevated," Dr. Govindarajan responded, "3 - 4." (R. 972.) The ALJ interpreted this to mean three to four hours per workday, and so this court does too. (*See* R. 26.)

### III. Administrative Hearing

#### A. Plaintiff's Statements

At the hearing before the ALJ on October 11, 2019, Plaintiff testified as follows: Due to his total knee replacements, Plaintiff is unable to stand or sit more than 30 minutes at a time; despite the surgeries, his left knee continues to "throb[]" on some days, making it "hard to get out of the bed," and his right knee "pop[s]," "bend[s]," and "locks sometimes." (R. 95–96.) Plaintiff also has "flat feet," for which he wears some type of cast, and his ankles "bend[] in." (R. 95, 97–98.) Plaintiff has used a cane since 2017, when an unidentified doctor prescribed it to him. (R. 107.) Plaintiff experiences swelling, mostly in the right leg but sometimes in the left. (R. 108.) His doctor has instructed him "to stay off [his] feet and keep [his] feet elevated and wear the compression stockings." (R. 108.) Plaintiff also has constant "stabbing" and "excruciating" pain in his hips, aggravated by standing and sitting. (R. 109.) He has "good days and bad days": on a good day, he can walk outside to the porch, sit up, and watch TV; on a bad day (about 15 or 16 per month), he does not want to get out of bed because it hurts to walk. (R. 109–10.) Plaintiff gets injections in his right hip every three months, but they are of little help most of the time. (R. 109.) He also gets injections in his lower back every four months, but did not say whether these were helpful. (R. 112.)

Plaintiff received disability benefits for four years, starting when he was 16 years old, due to his seizure disorder. (R. 82–83.) He still has staring seizures ("maybe four" of them in 2019), last about three to five minutes at a time. (R. 98-99.) He is not aware of his own seizures unless told by people who observe them. (R. 99.)

Plaintiff also described his mental health. He suffers depression and has "thoughts of suicide," though he stated that he does not "have a plan." (R. 110.) Plaintiff has sleeping problems, difficulty concentrating (in that when he starts on "one thing," he "end[s] up doing something else"), difficulty interacting with other people (in that he "can't go out . . . all I can really do is sit down and talk"), and "no motivation and no energy." (R. 110–12.) Plaintiff has been

14

staying in a homeless shelter or an unnamed friend's house. (R. 101.) Plaintiff mostly watches TV when staying with his friend; he does his own laundry, does some cleaning in the kitchen, and washes the dishes, but his friend cooks and shops for groceries. (R. 104–06.)

### B. Vocational Expert

Monika Debroweka, an impartial vocational expert (VE), also testified at the October 2019 hearing. The ALJ asked the VE to consider an individual of the same age, education, and work experience as Plaintiff, with the following limitations: light level of exertion; ability to stand for two hours and sit for six hours in an eight-hour workday; occasional bilateral pushing and pulling and use of foot controls; occasional ability to use stairs, ramps, to stoop, kneel, crouch, and crawl; but unable to use ladders, ropes, or scaffolds, to work on unprotected heights, on hazardous machinery, or to drive; uses a cane to ambulate; needs to wear a knee brace and an ankle brace; can understand, remember, concentrate, persist, and perform simple routine tasks in a low-stress environment; can attend for two hours at a time but will need a break every two hours for 15 minutes, which can be accommodated by routine breaks and lunch; and must be absent six to eight days per year due to seizure activity. (R. 115–18.)

The VE testified that with these limitations (specifically, being able to lift and carry but being limited to standing for two hours total), this hypothetical individual's level of exertion was sedentary.[30] (R. 116.) The VE further testified that the individual could not perform Plaintiff's past work but that there was work in the national economy for him—specifically, three sedentary, unskilled jobs (assembler, order clerk for food and beverage, and microfilming document preparer). (R. 116–18.) The ALJ then asked about a hypothetical individual with those limitations,

---

[30] The Social Security Administration's regulations define light work as lifting no more than 20 pounds at a time and carrying up to 10 pounds frequently, and "requir[ing] a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). The ability to perform light work typically encompasses the ability to perform sedentary work, "unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." *Id.* Sedentary work is defined as "one which involves sitting," as well as lifting no more than 10 pounds at a time and only occasionally walking and standing. *Id.* § 404.1567(a).

but who needed to elevate his right leg 90 degrees during the workday.  (R. 118.)  The VE testified that this limitation would preclude all work in the national economy, and she "would question whether the person can exit the work station."  (R. 118–19.)  On examination by Plaintiff's attorney, the VE also testified that missing more than eight days per year was work-preclusive, as was being off-task for more than 10 percent of the workday.  (R. 119.)

## IV.    ALJ Decision

The ALJ issued her decision on April 1, 2020.  (*See* R. 15–29.)  She followed the standardized five-step test laid out in 20 C.F.R. § 404.1520.  *See Mandrell v. Kijakazi*, 25 F.4th 514, 516 (7th Cir. 2022).

Under this test, the ALJ asks, first, whether the claimant is currently unemployed.  *See* 20 C.F.R. § 404.1520(a)(i), (b); *see also id.* § 404.1572(a)–(b) (defining "substantial gainful activity").  If the claimant is currently unemployed, then the ALJ moves to Step 2, asking whether the claimant has a severe impairment.  *See id.* § 404.1520(a)(ii), (c); *see also id.* § 404.1522 (defining "non-severe impairment").  If the claimant has a severe impairment, then the ALJ asks, in Step 3, whether the severe impairment meets or medically equals the severity of an impairment enumerated in the agency's regulations.  *See id.* § 404.1520(a)(iii), (d); *see also id.* § 404.1525 (describing the agency's listing of impairments); *id.* § 404.1526 (defining "medical equivalence"); *id.* Part 404, Subpart P, Appendix 1 (Listing of Impairments).  If the claimant's impairment does meet or medically equal a listing, then the claimant is deemed disabled.  *Id.* § 404.1520(a)(iii), (d).  If not, then the ALJ "pauses to determine the claimant's residual functional capacity . . . , defined as the most physical and mental work the claimant can do on a sustained basis despite her limitations."  *Mandrell*, 25 F.4th at 516; *see also* 20 C.F.R. § 404.1520(e); *see also id.* § 404.1545 (explaining the RFC assessment).  The ALJ then proceeds to Step 4, asking whether, given the claimant's RFC, they can still perform their former occupation.  20 C.F.R. § 404.1520(a)(iv), (f); *see also id.* § 404.1560(b)(1) (defining "past relevant work").  If the claimant can still perform their past relevant work, then benefits are denied; if not, the ALJ proceeds, finally, to Step 5, asking

whether the claimant is unable to perform any other work given their RFC, age, education, and work experience. *See id.* § 404.1520(a)(v), (g); *see also id.* § 404.1560(c) (explaining this assessment). If the claimant cannot adjust to any other work, then they are deemed disabled. *Id.*

At Step 1, the ALJ found that there have been continuous 12-month periods where Plaintiff did not engage in substantial activity. (R. 18.) At Step 2, the ALJ found that Plaintiff had the following severe impairments: obesity, status-post bilateral knee replacements, degenerative disc disease of the lumbar spine, seizure disorder, and depression. (R. 18.) At Step 3, the ALJ determined that these impairments, alone or in combination, did not meet or medically equal any impairments listed in the agency's regulations. (R. 18–21.)

Before turning to Step 4, the ALJ determined Plaintiff's RFC. The ALJ concluded that he could perform light work as defined in 20 C.F.R. § 404.1567(b), except for the following limitations:

> [T]he claimant can stand for two hours total in an eight-hour workday; the claimant can sit for a total of six hours in an eight-hour workday; limited to occasional bilateral pushing and pulling and use of foot controls for the lower extremities; no climbing ladders, ropes, and scaffolds; can occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; the claimant can never be exposed to unprotected heights, hazards, and vibration; the claimant can never drive a motor vehicle; the claimant needs a cane for ambulation; the claimant can understand, remember, concentrate, persist, and perform simple tasks in a low-stress environment (which is defined as having simple work-related decisions and routine changes in the work setting); the claimant can attend for two-hours at a time but will need a break every two-hours for fifteen minutes, which can be accommodated by routine breaks and lunch; and needs to wear a knee brace and an ankle brace; the claimant will need to be absent six to eight days a year due to seizure activity.

(R. 21.)

In making this RFC determination, the ALJ first considered Plaintiff's subjective symptoms. Reviewing Plaintiff's hearing testimony, the ALJ concluded that (1) Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that (2) Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 22.) The ALJ then stated again that Plaintiff's statements "are inconsistent with the medical

evidence of record." (R. 22.) This court is uncertain, based on these two statements, whether the ALJ completely or partially rejected Plaintiff's testimony due to apparent inconsistencies.

The ALJ also cited various portions of Plaintiff's medical records concerning his physical impairments, without analysis. (See R. 22–23.) In the following paragraph, the ALJ appeared to identify specific discrepancies between Plaintiff's alleged symptoms and the medical record, or specific pieces of medical evidence that appeared to be inconsistent with those reported symptoms. (*See, e.g.*, R. 23 ("Even though the claimant indicated walking makes his knee pain worse, the claimant was observed . . . with a normal musculoskeletal range of motion.").) Next, the ALJ offered several conclusions regarding Plaintiff's physical limitations, citing only Plaintiff's medical records:

- The claimant's high BMI, decreased lumbar spine tenderness, and antalgic gait support the claimant should be limited to light work with the standing and postural limitations as well as the requirement of a cane adopted in this case. However, the claimant's negative straight leg raise and normal strength support the claimant needs no further limitations based on his obesity and degenerative disc disease.

- The claimant's decreased bilateral knee range of motion, history of bilateral knee surgery, and abnormal knee diagnostic imaging indicate the claimant should be limited to the foot control, environmental, driving, and knee brace limitations as indicated in the residual functional capacity. Yet, the claimant's normal range of motion of the lower extremity and lack of effusion indicate the claimant need[s] no further limitations based on his degenerative joint disease.

- The claimant's history of seizures that are controlled with medicine direct the claimant would need to be absent from work between six and eight days a year as directed by the undersigned. Although, the claimant's normal cranial nerves direct the claimant needs no further limitations based on his seizures.

(R. 23–24 (record citations omitted).)

With respect to Plaintiff's mental health impairments, the ALJ first cited various portions of Plaintiff's medical records, again without analysis before noting purported inconsistencies between Plaintiff's subjective symptoms and the record. (*See, e.g.*, R. 24 ("Although the claimant indicated he has a history of suicidal thoughts, examination showed the claimant with full orientation and normal behavior.").) Finally, the ALJ offered the following conclusions about Plaintiff's mental health limitations:

- The claimant's abnormal PHQ-9 and GAD-7 scores with his abnormal mood and affect support the claimant should be limited to simple and routine tasks in a low-stress environment as defined and adopted in this case. However, the claimant's normal behavior and full orientation support the claimant needs no further limitations in this area of mental functioning.

- The claimant's allegations of difficulty concentrating with his normal attention and concentration at examination indicate the claimant would be able to concentrate[e] for two-hour periods on simple and routine tasks with break[s] every two-hours that are accommodated by normal breaks as indicated in the residual functional capacity.

(R. 24–25 (record citations omitted).)

The ALJ also commented on the medical opinions. She rejected as "non-persuasive" the opinions of the state agency consultants—Taylor (whose opinion was affirmed by Biscardi) and Skoubis (with whom Plaintiff had a consultative psychological examination)—that Plaintiff did not have a severe psychological disorder. (R. 25.) The ALJ found these opinions "unsupported" or "inconsistent" with medical evidence showing "abnormal mood and effect" and "inconsistent with the claimant's abnormal PHQ-9 and GAD-7, which indicate severe depression and anxiety." (R. 25.)

Concerning Plaintiff's physical limitations, the ALJ found those opinions—of Dr. Govindarajan, Dr. Wu, and the state agency consultants (Dr. Bilinsky, whose opinion was affirmed by Dr. Jones)—"partially persuasive." (*See* R. 25–26.) The state agency consultants' opinion was "partially supported" by medical evidence showing "high BMI, decreased lumbar spine, and decreased bilateral knee range of motion" and "partially consistent" with evidence showing "bilateral knee tenderness, spinal tenderness, and abnormal diagnostic imaging of the lumbar and right knee." (R. 25.) Dr. Govindarajan's opinions were "partially supported [by]. . . examinations that showed high BMI and antalgic gait" but inconsistent "with the claimant's normal musculoskeletal range of motion." Similarly, the ALJ deemed Dr. Govindarajan's opinions "partially consistent with the claimant's overall medical evidence that showed decreased knee range of motion and decreased lumbar spine range of motion but not with the claimant's normal coordination and normal sensation." (R. 26.) The ALJ found Dr. Wu's opinion "consistent with

the claimant's history of seizure but not the claimant's normal cranial nerves and coordination at examination" and "partially consistent with the claimant's overall medical evidence that also showed a history of seizures with normal cranial nerves." (R. 26.) Precisely which parts of the doctors' opinions the ALJ adopted or rejected is not clear from the record.

The ALJ then turned to Steps 4 and 5. At Step 4, the ALJ relied on the VE's testimony to determine that Plaintiff was unable to perform any past relevant work. (R. 27.) At Step 5, the ALJ again relied on the VE's testimony to conclude that Plaintiff would be able to perform the following jobs, all of which were sedentary and unskilled: assembler, order clerk for food and beverage, and microfilming document preparer. (R. 28.) The ALJ thus concluded that Plaintiff was "not disabled." (R. 28.)

## DISCUSSION

A reviewing court affirms the ALJ's decision unless the findings are not supported by "substantial evidence" or the decision has resulted from an error of law. *Mandrell*, 25 F.4th at 515 (citing *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019); and *Farrell v. Astrue*, 692 F.3d 767, 770 (7th Cir. 2012)). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek*, 139 S. Ct. at 1154 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The court does not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its judgment" for that of the agency. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (alteration omitted) (quoting *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)).

The court does not, however, merely "rubber-stamp" the agency's decision. *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018). The court must determine whether the agency has followed an "accurate and logical bridge" between the evidence and the conclusion. *Jeske v. Saul*, 955 F.3d 583, 587 (7th Cir. 2020) (quoting *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001)). This bridge enables the court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir.

2002). "While the ALJ need not evaluate every piece of testimony and evidence submitted, he must sufficiently articulate his assessment of the evidence to assure this court that he considered the important evidence and to enable this court to trace the path of his reasoning." *Palmer v. Barnhart*, 40 F. App'x 278, 284 (7th Cir. 2002) (citing *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir. 1993)). Without a logical bridge, the court may not uphold the ALJ's decision, even if there is enough evidence in the record to support the result. *See Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *see also Jeske*, 955 F.3d at 587 ("Our review is limited also to the ALJ's rationales; we do not uphold an ALJ's decision by giving it different ground to stand upon." (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943))).

Plaintiff contends, first, that the ALJ's RFC determination was not supported by substantial evidence because the ALJ (1) ignored Dr. Govindarajan's opinion that Plaintiff needed to elevate his leg, (2) failed to include his need for unscheduled breaks or a likely increased rate of absenteeism due to Plaintiff's seizure disorder, and (3) failed to analyze Plaintiff's impairments in combination, including how his obesity impacts his ability to sit and stand. Plaintiff contends, further, that the ALJ failed to properly assess the medical opinions of record and his allegations of subjective symptoms. As explained here, the court agrees with these contentions in part and remands this case for further proceedings.

## I.      Knee, Hip, and Back Limitations

### A.      Dr. Govindarajan's Opinions

The agency's regulations govern how ALJs evaluate medical opinions. The revised regulations, issued in 2017, apply to this case.[31]  20 C.F.R. § 404.1520c. Failure to comply with

---

[31]       The agency's revised regulations apply to claims filed on or after March 27, 2017. *See* 20 C.F.R. § 404.1520c. Plaintiff filed his application for disability benefits on February 23, 2018. (R. 250–51.) The revised regulations removed the old "treating physician rule," which generally required ALJs to give a treating physician's opinion "controlling weight." *See, e.g.*, *Olivas v. Saul*, 799 F. App'x 389, 391 & n.1 (7th Cir. 2019); *see also* 20 C.F.R. § 404.1520c ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . .").

these revised regulations is reversible error, subject to harmless error review. *Stevens v. Kijakazi*, No. 21 C 270, 2022 WL 1000598, at *7 (E.D. Wis. Apr. 4, 2022). An error is harmless only if the record permits the court to "predict with great confidence what the result on remand will be." *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011).

Under the applicable regulations, the ALJ must articulate how persuasive she finds all medical opinions in the case, considering the following factors: "supportability," "consistency," "relationship with the claimant," "specialization," and "other factors." 20 C.F.R. §§ 404.1520c(b)(2), (c)(1)–(5). Generally, however, an ALJ is required to explain in detail her assessment of just two most important factors: supportability and consistency. *Id.* § 404.1520c(b)(2). "Supportability measures how much the objective medical evidence and supporting explanations presented by a medical source support the opinion," whereas "consistency assesses how a medical opinion squares with other evidence in the record." *Michelle D. v. Kijakazi*, No. 21 C 1561, 2022 WL 972280, at *4 (N.D. Ill. Mar. 31, 2022) (citing 20 C.F.R. §§ 404.1520c(b)(1), (2)). "Put differently, the ALJ must analyze whether the medical source's opinion is (1) supported by the source's own records; and (2) consistent with the other evidence of record." *Rosado v. Comm'r of Soc. Sec.*, No. 20 C 2003, 2022 WL 1421371, at *3 (M.D. Fla. May 5, 2022). The ALJ must articulate how she considered the remaining regulatory factors—"relationship with the claimant," "specialization," and "other factors"—only if she finds two or more medical opinions to be "equally persuasive." 20 C.F.R. § 404.1520c(b)(3).

The opinions discussing Plaintiff's knee, hip, and back limitations were Dr. Govindarajan's opinions from July 2018 and August 2019 and the state agency consultants' opinions from May 2018 (Dr. Bilinsky) and October 2018 (Dr. Jones, affirming Dr. Bilinsky). As noted above, the ALJ found all these opinions "partially persuasive," because each was "partially consistent with and partially supported by the medical evidence of record." (*See* R. 25–26.) Although the ALJ did not clarify which of the opined limitations she rejected or adopted based on these persuasiveness findings, she generally adopted the state agency consultants' opinion while rejecting Dr.

Govindarajan's more restrictive limitations. The ultimate RFC determination included all of the state consultants' opined limitations: that Plaintiff could perform light work, could stand for two hours total and sit for six hours total (with no limitations for standing or sitting at one time), and had limited pushing and pulling and postural limitations (occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl; never climb ladders/ ropes/scaffolds). The ALJ apparently rejected Dr. Govindarajan's more restrictive limitations: that Plaintiff could sit for only 45 minutes at a time and for only two hours total in a workday (in 2018), or for only 30 minutes at once and for less than two hours total (in 2019); and that Plaintiff could stand for only 45 minutes at a time and less than two hours total. The ALJ did not address Dr. Govindarajan's opinions that Plaintiff needs to shift positions at will, to take unscheduled breaks, to walk every 90 minutes (in 2018) or every 10 minutes (in 2019), and to elevate his legs at 90 degrees for 25 percent of the workday (in 2018) or at 45 degrees for three to four hours a workday (in 2019). (*Compare* R. 876–78, 971–73*, and* R. 147–48*, with* R. 21.)

The court concludes that the ALJ's consistency analysis does not provide adequate justification, under the revised regulations, to reject Dr. Govindarajan's opined limitations. The ALJ found Dr. Govindarajan's opinion inconsistent with Plaintiff's "normal coordination and normal sensation" (R. 26), but this purported discrepancy does not explain why the ALJ rejected Dr. Govindarajan's opinion that Plaintiff needed greater walking, sitting, and standing limitations (due to his back, hip, and knee problems), to take unscheduled breaks (due to "muscular aches and chronic fatigue"), or to elevate his legs (due to swelling). The court cannot discern, from the ALJ's explanation, how Plaintiff's purportedly normal coordination and sensation is inconsistent with Dr. Govindarajan's opined limitations, which stem from different impairments and symptoms.

The Commissioner nonetheless contends that the ALJ's consistency analysis was adequate. He points out that, under the revised regulations, "when a medical source provides multiple medical opinion(s)," the ALJ may articulate how she considered all opinions "from that medical source together in a single analysis," and is "not required to articulate how [she]

considered each medical opinion . . . individually." 20 C.F.R. § 404.1520c(b)(1). While the ALJ was not required to march through each opined limitation to explain whether it was consistent with or supported by the record, nothing in the revised regulations overturns the Seventh Circuit's longstanding requirement that the ALJ build a logical bridge between the record and her conclusion. *See, e.g.*, *Scott*, 297 F.3d at 595. The court sees no clear connection between Dr. Govindarajan's opined limitations and the ALJ's application of the consistency factor.

The parties have not focused on supportability, but the court notes its uncertainty about the ALJ's application of that factor, as well. Supportability concerns the relevance of the objective medical evidence supporting a medical opinion. *See* 20 C.F.R. § 404.1520c(c)(1). In addressing that factor, ALJs may note, for example, "that the physician's own treatment notes do not support the physician's opinion, that the physician's opinion stems from a checklist, that the physician did not consider certain evidence, [that the physician] did not examine the claimant, or [that the physician] did not provide a detailed explanation for opinion." *See Starman v. Kijakazi*, No. 20 C 35, 2021 WL 4459729, at *4 (E.D. Mo. Sept. 29, 2021) (citations omitted) (collecting cases).

In this case, the ALJ found that Dr. Govindarajan's opinions were "partially supported with [her own] examinations that showed high BMI and antalgic gait but not with the claimant's normal musculoskeletal range of motion." (R. 26.) The first half of this analysis properly considers whether Dr. Govindarajan's "own treatment notes," *see Starman*, 2021 WL 4459729, at *4, or her "own records," *see Rosado*, 2022 WL 1421371, at *3, supported her opinion. But the only factor weighing *against* the supportability of Dr. Govindarajan's opinion was Plaintiff's normal musculoskeletal range of motion—for which the ALJ cited medical records only from Plaintiff's psychiatrist, Dr. Abbasi. (*See* R. 26 (citing R. 886 (July 30, 2018, office visit with Dr. Abbasi); R. 892 (same on September 11); R. 899 (same on November 19). These psychiatric records from another medical professional do not, in the court's view, sufficiently explain why the ALJ discounted Dr. Govindarajan's opinions as unsupported. Even if the ALJ believed that these records were inconsistent with Dr. Govindarajan's opinions, the court does not see the requisite

logical bridge. The ALJ never explained the significance of a normal musculoskeletal range of motion, particularly given findings that Plaintiff has decreased knee and lumbar spine range of motion--findings which the ALJ cited as consistent with Dr. Govindarajan's opinions. (*See* R. 26.)

Apart from the supportability and consistency factors, the court is concerned by the ALJ's failure to assess the state agency consultants' opinion as compared with Dr. Govindarajan's opinions. Despite finding each opinion "partially persuasive" and "partially consistent with and supported by" the medical evidence, the ALJ appears to have rejected Dr. Govindarajan's more restrictive limitations in favor of the state agency consultants' more lax limitations. But nowhere does the ALJ justify this. The Commissioner could have argued that—notwithstanding the similar "partially persuasive" findings—the ALJ found the state agency consultants' opinion *more* persuasive, but the court may not uphold an ALJ's decision based on post hoc speculation. *See Chenery,* 318 U.S. at 93–95; *see also Parker v. Astrue,* 597 F.3d 920, 922 (7th Cir. 2010) (explaining that the *Chenery* doctrine "forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced"). The ALJ must provide greater clarity about she comparatively weighed these "partially persuasive" opinions.[32]

The Commissioner has not argued that these errors were harmless, so remand is necessary. In any event, for reasons discussed below, the court cannot "predict with great confidence" that the ALJ would come to the same RFC determination had she properly assessed Dr. Govindarajan's opinions, because several limitations recommended by Dr. Govindarajan (which are at least plausibly supported by some record evidence) were omitted from the RFC analysis.

---

[32] It is also unclear whether, by labeling both the state agency consultants' opinion *and* Dr. Govindarajan's opinions as "partially persuasive," the ALJ meant that she found the opinions *equally* persuasive. Where an ALJ "find[s] that two or more medical opinions . . . about the same issue are both equally well-supported and consistent with the record but are not exactly the same," they must articulate how they "considered the other most persuasive factors": "relationship with the claimant," "specialization," and "other factors." 20 C.F.R. § 404.1520c(b)(3) (citations omitted). On remand, the ALJ should make clear whether the opinions are equally persuasive and (if so) articulate her consideration of the remaining regulatory factors.

### B.    Leg Elevation

The court concludes that the ALJ did not adequately explain portions of the RFC determination with respect to Plaintiff's need to elevate his legs or the adopted sitting/standing restrictions.

Before turning to the medical opinions, the ALJ concluded that some evidence (including Plaintiff's "negative straight leg raise," "normal strength," "normal range of motion of the lower extremity," and "lack of effusion") meant that he had no limitations based on his obesity, degenerative disc disease, and joint disease other than those included in the RFC. (R. 23.) Plaintiff first takes issue with the ALJ's failure to recognize a limitation related to his need to elevate his legs. In the July 2018 opinion, Dr. Govindarajan opined that Plaintiff needed to elevate his leg to 90 degrees for 25 percent of the workday due to bilateral edema (swelling of the soft tissue); in August 2019, she updated this limitation to 45 degrees for three to four hours per workday, depending on whether he was experiencing edema. (R. 877, 972.) The ALJ noted these limitations in her decision (but did not mention the 90- to 45-degree change) and asked the VE about the consequences of elevating one's leg at 90 degrees; the VE testified that this limitation would "preclude all work in the national economy." (R. 25–26, 118.) Nonetheless, the ALJ did not include any elevation limitation in her RFC determination, and the opinion sheds no light on why she declined to adopt such a limitation. The ALJ did not discuss Plaintiff's edema or lower extremity swelling when rejecting Dr. Govindarajan's opinions. Nor does the ALJ's RFC analysis mention these issues, let alone explain why she adopted no leg-elevation limitation.

In response, the Commissioner claims that Plaintiff ignores the "context" around Dr. Govindarajan's leg elevation opinion, because "the record demonstrates that [P]laintiff's swelling in his right leg was in response to his right knee surgery and improved over the course of several months." (Def.'s Mem. [20] at 4–5.) But the ALJ herself did not hint at this rationale in her opinion, and, again, the court is unwilling to uphold her decision based on "post-hoc rationalizations [from] the Commissioner." *Phillips v. Astrue*, 413 F. App'x 878, 883 (7th Cir. 2010); *see also Chenery,*

318 U.S. at 93–95.  Moreover, evidence in the record undermines the Commissioner's account. Beginning with the first medical records in this case, Dr. Govindarajan consistently noted Plaintiff's chronic *bilateral* edema.  (*See, e.g.*, R. 396–97, 802.)  Her opined elevation limitation was not expressly limited to Plaintiff's right leg and was included in her July 2018 opinion—that is, before the March 2019 right knee surgery.  Other records predating that surgery also confirm Plaintiff's bilateral edema.  (*See, e.g.*, R. 648.)  There is also evidence that, after some post-surgery improvement, Plaintiff's condition worsened; he visited the emergency room for swelling twice in the summer of 2019.  (*See* R. 1359–60, 1414.)  This evidence easily distinguishes the Commissioner's cited case.  *See Britt v. Berryhill*, 889 F.3d 422, 426 (7th Cir. 2018) (holding that an ALJ did not err in failing to adopt a doctor's recommendation that the claimant elevate his foot as needed, because (1) it was a temporary recommendation made immediately after the injury and almost a year before the alleged onset date, (2) no objective medical evidence after the onset date supported the limitation, and (3) a medical expert opined that the elevation was not medically necessary after the onset date).

As the Commissioner also notes, the July 2018 and August 2019 opinions differed in the amount of elevation necessary (90 degrees versus 45 degrees).  (Def.'s Mem. at 4.)  To the extent the Commissioner argues that Dr. Govindarajan's leg-elevation opinions were not persuasive because of this change, the ALJ herself did not articulate that rationale.  *See Chenery*, 318 U.S. at 93–95.  Nor is the court prepared to endorse the Commissioner's assumption that because the VE referred to a 90-degree elevation limitation as work-preclusive, a 45-degree elevation limitation would not be.  The Commissioner also misses the point in arguing that the ALJ did not "b[i]nd herself to finding that [P]laintiff must elevate his legs by including it in a hypothetical question to the VE."  (Def.'s Mem. at 5.)  The court does not hold that the ALJ *must* include Dr. Govindarajan's opined elevation limitation (or any other limitation) in the RFC determination. Rather, the court holds that the ALJ may not ignore this evidence and reject Dr. Govindarajan's opinion without explaining that decision.

### C.    Obesity

The court also concludes that the ALJ did not adequately explain why she adopted the less restrictive standing restrictions of the state agency consultants but rejected the more restrictive limitations proposed by Dr. Govindarajan.  Plaintiff contends that the ALJ did not consider "the impact of obesity on multiple musculoskeletal impairments and Plaintiff's reported pain."  (Pl.'s Mem. [14] at 10.)  In support, Plaintiff lists his musculoskeletal impairments and then cites to Social Security Administration regulations stating that "obesity could impact a claimant's ability to sit or stand."  (*Id.* (citing SSR 19-2p).)

Plaintiff has a BMI of over 40, which qualifies as "morbidly obese," *Browning v. Colvin*, 766 F.3d 702, 704 (7th Cir. 2014), and testified that his pain is aggravated by standing and sitting (R. 109).  The ALJ found Plaintiff's high BMI severe but not automatically disabling.  (R. 18—21.) In the RFC determination, the ALJ concluded that Plaintiff's "high BMI, decreased lumbar spine tenderness, and antalgic gait" meant that he "should be limited to light work with the [adopted] standing and postural limitations" and cane requirement, but that his "negative straight leg raise and normal strength support . . . no further limitations based on his obesity and degenerative disc disease."  (R. 23.)  This standing limitation restricted Plaintiff to standing for two hours total, and although the ALJ did not mention it in her analysis, she also concluded that Plaintiff could sit for six hours total.  (R. 21.)  These limitations mirror the state agency consultants' opined limitations (R. 147), but are inconsistent with Dr. Govindarajan's conclusions that—with slight variation between the 2018 and 2019 opinions—generally limited Plaintiff to sitting and standing for just 30 or 45 minutes at a time and for only two hours or less total in an eight-hour workday.  (R. 876–77, 971–72.)

The court concludes that the ALJ did not adequately explain how she determined that Plaintiff could sit for six hours total, with no unscheduled breaks, and without limitation on how long he could sit at once.  An ALJ must analyze a claimant's impairments in combination, including how obesity aggravates or exacerbates other conditions.  *See Gentle v. Barnhart*, 430 F.3d 865,

868 (7th Cir. 2005). On numerous occasions, the Seventh Circuit has explained that obesity may interact with disc disease or arthritis to make standing or sitting for prolonged periods more painful. *See id.* In particular, near-morbid obesity can "make it difficult for [an individual] to sit for long periods of time, as sedentary work normally requires." *Browning*, 766 F.3d at 707; *see Wyatt v. Colvin*, No. 14 C 3252, 2015 WL 3919058, at *8 (N.D. Ill. June 24, 2015) (remanding where the ALJ failed to explain how Plaintiff's morbid obesity might affect her ability to sit for sedentary work). The ALJ found that the only work that Plaintiff could perform was three sedentary occupations (*see* R. 28), but she did not mention Plaintiff's obesity or provide analysis supporting Plaintiff's ability to sit for six hours. Plaintiff's "negative straight leg raise and normal strength" (the proffered reasons why Plaintiff needed no further limitations due to obesity and disc disease) are not directly relevant to the issue of obesity.

The Commissioner argues that the RFC was supported by the medical opinions of record because the ALJ adopted the limitations opined by the state agency medical consultants, who were aware of Plaintiff's BMI. (Def.'s Mem. at 8.) *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (finding harmless error where the ALJ did not explicitly consider plaintiff's obesity because the ALJ "adopted the limitations suggested by the specialists and reviewing doctors, who were aware of [plaintiff's] obesity"). But the ALJ rejected the opinions of Dr. Govindarajan, who was also aware of Plaintiff's obesity. Indeed, the ALJ found that Dr. Govindarajan's and the consultants' medical opinions were both "partially supported" by Plaintiff's high BMI but, as discussed above, provided no explanation of how she chose between these competing opinions. (*See* R. 25–26.) The court also rejects the Commissioner's argument that any error is harmless because Plaintiff "did not explain how [his] obesity hampers [his] ability to work." *Stepp v. Colvin*, 795 F.3d 711, 720 (7th Cir. 2015) (quoting *Dornseif v. Astrue*, 499 F. App'x 598, 600 (7th Cir. 2013)). Plaintiff noted that obesity can affect the ability to stand and sit, and the record contains medical opinions with more restrictive standing and sitting limitations than those adopted by the ALJ.

On remand, the ALJ must revisit her assessment of Dr. Govindarajan's medical opinions and adequately explain her RFC determination. The court expresses no opinion on whether the record compels the ALJ to adopt Dr. Govindarajan's opinions or any specific limitation.

## II.    Seizure Limitations

The court also remands for the ALJ to reassess the opinion from Dr. Wu who treated Plaintiff's seizure disorder. The ALJ found Dr. Wu's opinion "partially persuasive"—the same level of persuasiveness as the opinion from the state agency consultants, who had also opined on the limitations necessary due to Plaintiff's seizure disorder. (R. 26.) But, once again, the ALJ did not clarify which of the opined limitations she adopted or rejected based on this finding. The RFC included the environmental limitations identified by the state consultants and by Dr. Wu (no heights or hazards) and Dr. Wu's additional opinion that Plaintiff could work only in low-stress jobs and could not drive. The ALJ apparently rejected, however, Dr. Wu's opinion that Plaintiff's seizure disorder may disrupt coworkers, would cause him to be absent one day per month (rather than six to eight days per year, as the ALJ determined), and required Plaintiff to take an unknown number of unscheduled breaks (rather than routine breaks every two hours, as the ALJ determined).[33] (*Compare* R. 1405–07*, with* R. 21.)

The court concludes that the ALJ did not adequately explain how she decided to pick and choose among the different opined limitations concerning Plaintiff's seizure limitations, given that all these opinions were "partially persuasive" and concerned the same impairments. The ALJ failed to properly evaluate the supportability and consistency factors, as required for all medical opinions. 20 C.F.R. § 404.1520c(b)(2). Moreover, to the extent the ALJ found these opinions *equally* persuasive, she was required to evaluate all regulatory factors, not just supportability and consistency. *See* 20 C.F.R. § 404.1520c(b)(3). The ALJ found Dr. Wu's opinion "consistent with

_____

[33]    It appears the ALJ may have based this two-hour limitation not on Plaintiff's seizure disorder but instead on his mental health impairments, discussed below.

the claimant's history of seizure[s] but not the claimant's normal cranial nerves and coordination at examination" and "partially consistent with the claimant's overall medical evidence that also showed a history of seizures with normal cranial nerves." (R. 26.) But this analysis does not mention supportability, and the court cannot assume that the ALJ intended for it to serve as an analysis of that factor.

The ALJ's discussion of the consistency factor is also flawed. The ALJ found Dr. Wu's opinion inconsistent with Plaintiff's "coordination," but she pointed to no medical records suggesting that lack of coordination was associated with the frequency or severity of Plaintiff's seizures. (*See* R. 26 (citing R. 1032, 1073, 1077–78, 1328).) The ALJ also concluded that Dr. Wu's opinion was inconsistent with Plaintiff's "normal cranial nerves," but "partially consistent" with Plaintiff's "history of seizures with normal cranial nerves." This explanation is unclear on its own terms; if Plaintiff historically had seizures despite having normal cranial nerves, the court does not see how his *currently* having normal cranial nerves undermines Dr. Wu's opinion concerning seizures. Where the cited medical records refer to cranial nerves, the medical provider simply noted this in Plaintiff's physical examination under "neurology"—but without any reference to his seizure disorder. (*See* R. 26 (citing R. 774, 783–84, 801, 909, 928).) It therefore appears that the ALJ independently interpreted medical evidence about Plaintiff's normal cranial nerves to determine its impact on his seizures. But "ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves." *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014). Contrary to the Commissioner's suggestion, the ALJ did not simply compare Dr. Wu's opinion to "evidence from other medical sources" in the record, *see* 20 C.F.R. § 404.1520c(c)(2); the Commissioner points to no medical evidence corroborating the ALJ's connection between cranial nerves and seizures. Rather, the ALJ appears to have improperly played doctor by independently interpreting the meaning of Plaintiff's "normal" cranial nerves. *Cf. Moon*, 763 F.3d at 722 (remanding where the ALJ relied on an "unremarkable" MRI as evidence that the claimant's migraines were not a significant problem).

31

The court concludes that this error requires remand.  When analyzing the medical records, the ALJ concluded that Plaintiff's "history of seizures that are controlled with medicine" meant that Plaintiff "would need to be absent from work between six and eight days a year," but his "normal cranial nerves" meant he "needs no further limitations based on his seizures."  (R. 24.)  This conclusion implicitly rejected Dr. Wu's opinion that Plaintiff needs an unknown number of unscheduled breaks and would be absent about one day per month; that rejection was notable given that the VE testified that missing more than eight days per year would be work-preclusive.  (R. 119.)  In determining the RFC, the ALJ never made a clear finding on the severity or frequency of Plaintiff's seizures; at Step 2 of the sequential process, the ALJ apparently adopted Dr. Wu's opinion that Plaintiff experienced two to three seizures per month, even on medication.  (*See* R. 19 ("[M]edical records show the claimant has a history of seizures that happen two or three times per month but is well controlled with medication.").)  There is no explanation for the ALJ's decision to reject Dr. Wu's opinions on absenteeism and unscheduled break while adopting the underlying evidence supporting those opinions.  Nor did the ALJ provide any analysis of her own to support the conclusion that Plaintiff would be absent between six and eight days, a number seemingly chosen at random.

The Commissioner's arguments concerning the seizure-related limitations are not persuasive.  The Commissioner argues that the ALJ's absenteeism limitation is not inconsistent with Dr. Wu's opinion, because Dr. Wu completed a check-box form indicating that Plaintiff would miss about one day per month, and, according to the Commissioner, missing eight days per year "most closely aligns with Dr. Wu's opinion over the nearest alternative options of missing zero or about two days per month."  (Def.'s Mem. at 7.)  This impermissible speculation does not hold up.  Dr. Wu added handwritten notes to the check-box form in other contexts; she could have written six to eight days per year if that was her opinion.  (*See, e.g.*, R. 1406 (writing "Maybe" instead of marking the existing "Yes" or "No" boxes).)  The Commissioner also contends that Plaintiff experienced seizures less frequently than Dr. Wu opined.  (*See* Def.'s Mem. at 6 n.1.)  The record

may support such a finding, but the ALJ did not come to this conclusion.  Instead, the ALJ apparently weighed conflicting evidence and agreed with Dr. Wu's underlying frequency and severity opinion but, without explanation, rejected Dr. Wu's corresponding limitations.  The court must remand for further clarification.  *See Sarchet*, 78 F.3d at 307 ("[W]e cannot uphold a decision by an administrative agency . . . if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.").

### III.  Mental Limitations

Finally, Plaintiff argues that the ALJ erred with respect to his mental health impairments (mainly, depression).  Medical opinions concerning this issue came from the state agency consultants (Skoubis, Taylor, and Biscardi), who opined that Plaintiff did not have a severe psychological disorder and needed no functional limitations.  The ALJ herself rejected these opinions as "non-persuasive" because they were unsupported by and inconsistent with medical evidence of abnormal mood, effect, and PHQ-9 and GAD-7 scores (tests for depression and anxiety).  (R. 25.)  Additionally, the ALJ determined that Plaintiff's depression was a severe impairment, though not severe enough to qualify for a listing; when assessing this severity, the ALJ found that Plaintiff had "moderate limitations" in his "ability to concentrate, persist, or maintain pace," plus mild limitations in other areas of mental functioning.  (R. 20.)  The ALJ then came to her own conclusion about the limitations for Plaintiff's mental health impairments:  He can (1) "understand, remember, concentrate, persist, and perform simple tasks in a low-stress environment (which is defined as having simple work-related decisions and routine changes in the work setting)" and (2) "attend for two-hours at a time but will need a break every two-hours for fifteen minutes, which can be accommodated by routine breaks and lunch."  (R. 21.)

Plaintiff argues that, by rejecting all medical opinions on his mental impairments, the ALJ created an evidentiary gap, which she improperly filled with her own lay opinion.  In support, Plaintiff points to *Suide v. Astrue*, 371 F. App'x 684 (7th Cir. 2010).  There, the Seventh Circuit

remanded because the ALJ had created an "evidentiary deficit" by rejecting the treating doctor's opinion, and "[t]he rest of the record simply d[id] not support the parameters included in the ALJ's residual functional capacity determination." *Id.* at 690. But as numerous district courts have concluded, *Suide* does not hold that an ALJ may not "arrive at an RFC" only if she had "a physician's opinion to rely upon, because that's not the law." *Mason v. Colvin*, No. 13 C 2993, 2014 WL 5475480, at *8 (N.D. Ill. Oct. 29, 2014); *see also Schmidt v. Astrue,* 496 F.3d 833, 845 (7th Cir.2007) ("[A]n ALJ must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions any of the claimant's physicians."). Rather, "[r]emand was required in *Suide* because the rejection of the physician's medical opinion left the ALJ's RFC determination untethered to any record evidence." *Benito M. v. Kijakazi*, No. 20 C 5966, 2022 WL 2828741, at *3 (N.D. Ill. July 20, 2022) (quoting *Herren v. Saul*, No. 20 C 156, 2021 WL 1192394, at *5 (E.D. Wis. Mar. 30, 2021)).

Though there is no bright-line rule that rejecting all medical opinions requires remand, the court nonetheless concludes that remand is required here. In numerous cases, the Seventh Circuit has emphasized that an ALJ must account for moderate limitations in the claimant's ability to concentrate, persist or maintain pace.[34] *See, e.g.*, *Varga v. Colvin*, 794 F.3d 809, 813–14 (7th Cir. 2015). Under this precedent, "catch-all terms" like " 'simple, repetitive tasks' " are generally insufficient, because "there is no basis to conclude that they account for problems of concentration, persistence or pace." *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019) (quoting *Winsted v. Berryhill*, 923 F.3d 472, 477 (7th Cir. 2019)). At the same time, such terms are not automatically in error; "a limitation to unskilled work can account for concentration difficulties if

---

[34] The Seventh Circuit has similarly explained that moderate limitations in concentration, persistence, and pace must be properly posed to the VE. *See Varga*, 794 F.3d at 813–14. Here, the ALJ's questions to the VE mirrored the ultimate RFC determination, which limited Plaintiff to routine breaks and "simpl[e] routine tasks in a low-stress environment [defined] as having simple work-related decisions and routine changes in work setting." (*See* R. 117.) Thus, if the limitations did not account for Plaintiff's concentration difficulties, neither did the questions considered by the VE.

the record indicates that it addresses the underlying symptoms." *Christopher G. v. Kijakazi*, No. 19 C 5046, 2022 WL 1989119, at *4 (N.D. Ill. June 6, 2022) (collecting Seventh Circuit cases). The court concludes that the ALJ in this case did not adequately explain how the adopted limitations (routine breaks and unskilled work) account for Plaintiff's moderate concentration, persistence, and pace difficulties, nor did she rely on a medical opinion to explain this. *Cf. Burmester*, 920 F.3d at 511 ("[A]n ALJ may reasonably rely upon the opinion of a medical expert who translates [concentration, persistence, and pace] findings into an RFC determination.").

First, the ALJ found that Plaintiff could attend for two hours at a time, which was accommodated by routine breaks and lunch. But this "essentially amounts to no limitation at all." *Amy R. v. Kijakazi*, No. 21 C 260, 2022 WL 796332, at *4 (S.D. Ind. Mar. 15, 2022). It "does not make sense that [Plaintiff], who has moderate limitations in [his] ability to maintain attention and concentration, 'would require the same frequency of breaks as a typical worker.'" *Id.* (quoting *Warren v. Colvin*, No. 12 C 3298, 2013 WL 1196603, at *5 (N.D. Ill. Mar. 22, 2013)). Nor did the ALJ explain her finding that Plaintiff could concentrate for two hours at a time. The ALJ apparently discounted Plaintiff's "allegations of difficulty concentrating" because of his "his normal attention and concentration," as evidenced by office visits where Plaintiff's psychiatrist, Dr. Abbasi, noted "intact" attention span and concentration. (*See* R. 27 (citing R. 886, 892, 899).)

But this evidence shows only that Plaintiff could pay attention "in the context of a structured, relatively short mental health examination, an altogether different environment than a full day at a competitive workplace with sustained demands." *Crump*, 932 F.3d at 571; *see also Brian P. v. Saul*, No. 18 C 3498, 2020 WL 231081, at *4 (N.D. Ill. Jan. 15, 2020) (finding that a primary care provider's records of normal attention span and intact memory did not support the ALJ's two-hour concentration finding). The ALJ also noted that Plaintiff could "perform simple calculations" at an examination and prepare simple meals, watch TV, and manage his funds. (*See* R. 20, 24.) "But those are all short-term tasks that can mostly be done (or abandoned) on one's own time." *Henson v. Kijakazi*, No. 20 C 45, 2021 WL 4452543, at *4 (N.D. Ind. Sept. 28,

2021).  Significantly, no doctor opined that Plaintiff is capable of attending to tasks for two hours at a time.  *See Brian P.*, 2020 WL 231081, at *4.  As noted above, the ALJ rejected the state agency consultants' opinions on Plaintiff's mental impairments, and Dr. Govindarajan (whose opinion the ALJ found partially persuasive) in fact opined that Plaintiff's pain or other symptoms would "frequently" (meaning between one-third and two-thirds of the workday) interfere with his concentration.  (R. 876, 971.)

Second, the ALJ concluded that Plaintiff should be limited to "simple tasks in a low-stress environment," defined as "having simple work-related decisions and routine changes in the work setting."  (R. 21.)  It is not clear why the ALJ felt that this limitation—which essentially restricts Plaintiff to unskilled work, *see Christopher G.*, 2022 WL 1989119, at *5—accommodated Plaintiff's concentration issues.  The ALJ noted Plaintiff's "abnormal PHQ-9 and GAD-7 scores" (which indicated moderate to severe depression and anxiety) and "his abnormal mood and affect." (R. 24.)  But the ALJ built no logical bridge between these underlying symptoms of depression and the conclusion that Plaintiff can nevertheless perform unskilled work.  *Compare Dudley v. Berryhill,* 773 F. App'x 838, 842 (7th Cir. 2019) (holding that restricting claimant to "simple, routine and repetitive tasks" and "work requiring the exercise of only simple judgment" adequately accommodated her stress- and panic-related concentration difficulties), *with Varga*, 794 F.3d at 814–15 (holding that restricting claiming to "simple, routine, and repetitive tasks" and "simple work related decisions with few if any [workplace] changes" did not account for her concentration difficulties "related to [claimant's] diagnosed anxiety and depression, as well as her physical problems and pain").  Significantly, Dr. Govindarajan's opinions suggest that Plaintiff's concentration issues arose from his knee, hip, and back pain, in combination with his depression. (*See* R. 876, 971 (noting that Plaintiff's depression "affect[s] [his] physical condition").)  Limiting a person to unskilled work does not necessarily address concentration problems due to "physical problems and pain."  *See Varga*, 794 F.3d at 815.

The Commissioner contends that "[t]here is no error when there is no doctor's opinion contained in the record [that] indicated greater limitations than those found by the ALJ." (Def.'s Mem. at 9 (quoting *Best v. Berryhill*, 730 F. App'x 380, 382 (7th Cir. 2018)).) But none of the Commissioner's cited cases concern a situation where the ALJ completely rejected all medical opinions of record and failed to explain how she filled the evidentiary gap. *See, e.g.*, *Karla J.B. v. Saul*, No. 19 C 50019, 2020 WL 3050220, at *5 (N.D. Ill. June 8, 2020) ("[T]he ALJ committed no error by finding Plaintiff more limited than any medical experts opined necessary because the ALJ partially relied on the only medical opinions available when making that determination," and "adequately explain[ed] the specific limitations he found necessary"). In any event, Dr. Govindarajan's opinions do contain limitations more restrictive than what the ALJ adopted, and her opinions incorporated Plaintiff's concentration and physical pain issues. (*See* R. 877, 972 (opining that Plaintiff needed to take unscheduled breaks between one and four times a day due to muscular aches and fatigue).) The court ALJ should provide further clarification concerning Plaintiff's mental limitations on remand.

## CONCLUSION

The court reverses the ALJ's decision and remands for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g). The Commissioner's motion for summary judgment [19] is denied. Civil case terminated without prejudice.

ENTER:

Dated: September 30, 2022

_____
REBECCA R. PALLMEYER
United States District Judge